# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 21, 2009

Charles R. Fulbruge III
Clerk

No. 06-70053

PAUL EVERETTE WOODWARD,

Petitioner - Appellant

v.

CHRISTOPHER B EPPS, COMMISSIONER, MISSISSIPPI DEPARTMENT
OF CORRECTIONS,

Respondent - Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before BARKSDALE, STEWART, and PRADO, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Paul Woodward was convicted of capital murder and sentenced to death. After exhausting state court proceedings, Woodward filed a petition for habeas relief in the federal district court. The district court denied the requested relief, but it issued a certificate of appealability ("COA") as to three issues: whether Woodward's constitutional rights were violated (i) when his trial counsel conceded guilt to the jury without first securing Woodward's consent; (ii) by his attorney's failure to object to the State's use of other bad acts in its closing arguments; and (iii) by the trial court's refusal to provide Woodward with funds to secure an independent psychiatrist to (a) help prepare a mitigation defense

1

and (b) help prepare defense counsel for cross-examination of the state's mental health experts. The district court denied, but this court granted, Woodward's request for a COA on a fourth issue, whether the State's use of peremptory challenges at Woodward's resentencing violated his Fourteenth Amendment right to equal protection under *Batson v. Kentucky*, 476 U.S. 79 (1986).[1] For the foregoing reasons, we affirm.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On appeal, Woodward does not dispute the facts of the crime as recounted by the Mississippi Supreme Court in *Woodward v. State*, 843 So. 2d 1 (Miss. 2003) ("*Woodward IV*"):

> Around noon on July 23, 1986, Rhonda Crane, age twenty-four, was traveling on Mississippi Highway 29 south of New Augusta in Perry County, Mississippi to join her parents on a camping trip. A white male driving a white log truck forced her car to stop in the middle of the road. The white male then exited the truck with a pistol in his hand and forced Crane to get into his truck. The man then drove the victim to an isolated area, forced her out of his truck and into the woods at gunpoint and forced her to have sexual relations with him. Rhonda Crane was shot in the back of her head and died.
>
> Crane's automobile was left on the highway with the engine running, the driver's door open and her purse on the car seat. A motorist traveling in a vehicle on the same highway saw a white colored, unloaded, logging truck moving away from the Crane vehicle, and notified the authorities. Additionally, a housewife residing on a bluff along the highway at the location of the Crane car noted a logging truck with a white cab stop in front of her driveway. A white male exited and walked toward the back of his truck and returned with a blonde haired woman wearing yellow clothing. As he held her by her arm, the male yelled sufficiently loud for the housewife to hear the words "get in, get in," and forced

---

[1] Woodward also appeals the district court's denial of his request for funds to retain an expert under 21 U.S.C. § 848. As we discuss *infra* Part III.C., we will also consider this claim.

the blonde woman into the driver's door of the truck and then drove off. The housewife investigated the scene on the highway in front of her house, discovered the abandoned Crane car, and notified the authorities.

Law enforcement officers began an investigation to locate Crane. The officers discovered that Paul Everette Woodward unloaded logs at a pulp mill and departed the yard at 11:36 a.m. in a white Mack log truck. Woodward arrived at his wood yard at approximately 12:45 to 1:00 p.m. The yard manager noted that he was late arriving at the yard and was wet from sweating. A drive from the mill to the wood yard takes approximately thirty minutes. A sheriff's deputy stopped Woodward, who was driving a white Mack logging truck, around 2:00 p.m. on the afternoon of July 23, to ask if he had seen anything that would assist in the investigation of Rhonda Crane's disappearance. Woodward replied that he had not seen anything. Through the investigation, it was ascertained that Woodward was the only driver of a white logging truck operating at the nearby timber yards on that date. On the following day, Crane's body was located in the nearby wooded area by her father and a friend.

Woodward was arrested, and ultimately he made both written and videotaped confessions. Woodward also confessed to his employer over the telephone.

*Id.* at 4-5.

Woodward was charged with kidnapping, oral sexual battery, and capital murder with an underlying crime of rape. He was tried before a jury and convicted of all counts. In a separate sentencing hearing, the jury sentenced Woodward to death for the capital murder conviction.[2] Woodward appealed, raising numerous issues regarding the guilt-innocence phase and the sentencing phase of the trial. The Mississippi Supreme Court affirmed the conviction and sentence. *Woodward v. State*, 533 So. 2d 418 (Miss. 1988), *cert. denied*, 490 U.S. 1028 (1989), *reh'g denied*, 490 U.S. 1117 (1989) ("*Woodward I*").

---

[2] He was also sentenced to two thirty-year sentences on the kidnapping and oral sexual battery charges, to run consecutively.

Woodward then filed his first application for post-conviction relief to the Mississippi Supreme Court, and the court vacated his death sentence and remanded for a new sentencing. *See Woodward v. State*, 635 So. 2d 805 (Miss. 1993) ("*Woodward II*"). On remand, the court again imposed the death sentence, which was affirmed on direct appeal. *Woodward v. State*, 726 So. 2d 524 (Miss. 1997), *cert. denied* 526 U.S. 1041 (1999) ("*Woodward III*"). Woodward filed another petition for post-conviction relief, which the Mississippi Supreme Court denied. *Woodward IV*, 843 So. 2d at 21.

Woodward filed his federal habeas petition in March 2004, and the district court denied relief. Woodward sought a COA on four issues, relating to (1) his counsel's concession of guilt without securing his consent; (2) his counsel's failure to object to the introduction of other bad acts; (3) the trial court's refusal to fund an independent psychiatrist on re-sentencing; and (4) an alleged violation of *Batson*, based on the State's use of peremptory challenges to strike every black juror. The district court granted a COA on issues 1, 2, and 3, and denied a COA for issue 4; and we granted a COA for that issue: whether Woodward was entitled to habeas relief under *Batson*.

## II. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act ("AEDPA") controls our review in this case. *See Penry v. Johnson*, 532 U.S. 782, 792 (2001); *Wood v. Quarterman*, 491 F.3d 196, 201 (5th Cir. 2007). 28 U.S.C. § 2254(d) prohibits a federal court from granting a petition for a writ of habeas corpus with respect to a claim adjudicated on the merits in state court unless that adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see Penry*, 532 U.S. at 792. The state court's decision is contrary to the Supreme Court's clearly established precedent if the state court either "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a [different result]." *Penry*, 532 U.S. at 792 (internal quotations and citations omitted). The state court's decision is an unreasonable application of the Supreme Court's clearly established precedent if it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." *Id.* (internal quotations and citations omitted).

"We must presume that the state court's factual findings are correct unless [Woodward] meets his burden of rebutting that presumption by clear and convincing evidence." *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009) (citing 28 U.S.C. § 2254 (e)(1)). "In reviewing the district court's application of § 2254(d) to the state court decision, the district court's findings of fact are reviewed for clear error; [the district court's] conclusions of law, *de novo*." *Pondexter v. Quarterman*, 537 F.3d 511, 519 (5th Cir. 2008) (citing *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002)).

## III.  DISCUSSION

### A.    *Ineffective Assistance of Counsel: Concession of Guilt*

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend VI. Under the well-established *Strickland* test, Woodward must show (1) that his counsel's performance was deficient, and (2) that the deficient performance prejudiced his

defense. *Strickland v. Washington*, 466 U.S. 668, 689-94 (1984). Under the first prong, "[t]o establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (citation omitted). Counsel "is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

"[T]o establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Wiggins*, 539 U.S. at 534 (citation omitted). There are, however, "some egregious circumstances . . . 'so likely to prejudice the accused that the cost of litigating their effect in a particular trial is unjustified.'" *Burdine v. Johnson*, 262 F.3d 336, 344 (5th Cir. 2001) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)). Prejudice is presumed where (1) there is a complete denial of counsel, or (2) counsel entirely fails to subject the prosecution's case to meaningful adversarial testing. *Cronic*, 466 U.S. at 659.

During the guilt-innocence phase of trial, Woodward's counsel divided responsibility for the closing arguments. First, Jeff Bradley argued reasonable doubt as to each of the crimes upon which the jury was instructed. Next, Woodward's other attorney, Rex Jones, concluded the defense's closing arguments. Seconds into his argument, Jones made the following statement to the jury:

> I think – I'm going to say something, I've never lied to Juries and I'm not going to start now, I think Paul Woodward is guilty of kidnapping Rhonda Crane, and I think Paul Woodward is guilty of the murder of Rhonda Crane. Now, we do have a problem, I think legally, in regard to the charges he's guilty of. The Court has instructed you that you've got to take the version of the Defendant

as true if and unless it is contradicted by eyewitnesses or by other evidence. I don't know what happened out there that day, and I'm not going to stand here and try to convince you one way or the other. You've heard the same thing I've heard.

Almost immediately, the State objected that "the defense attorney has just interjected that the Defendant is guilty of the charge of kidnapping and murder." The State requested that the court give Woodward an opportunity to express whether he was in agreement with his counsel's tactics. The following exchange ensued:

| COURT: | Well, I certainly feel like this Defendant has been afforded a fair trial. |
| | Do you have any problems with this proceeding, Mr. Woodward? |
| WOODWARD: | No, sir. |
| COURT: | You've had a fair trial, hadn't you? |
| WOODWARD: | Yes, sir. |
| COURT: | All right. Thank you. |
| MR. WHITE:[3] | Does he understand what – |
| COURT: | Do you understand what Mr. Jones said? |
| WOODWARD: | Yes, sir. |
| COURT: | All right. |
| MR. WHITE: | Does he agree with it? |
| MR. BRADLEY: | Your honor, he said that– |
| MR. WHITE: | I ask that that be noted in the record that he is in agreement with the trial proceedings. |
| COURT: | All right. Let that so be noted. |

---

[3] Glenn White was counsel for the State.

Jones then continued his summation. In addressing the rape charge, he stated:

> The thing that is troubling me in regards to the rape – I'm not saying that he raped her at some point – he said in the statement that it wasn't, but I'm not saying he didn't, but the thing that's troubling to me, at the time of the killing, at the time of the killing, she was fully clothed, no clothing was torn, and I realize you say to me – I know what they're going to say, "Well you know, if you had a gun on you, you would submit" and certainly I would and I don't deny that, but I don't know at what point in time that occurred. . . . So, what I am trying to say is that while I think that maybe what he did is turned and ran and fired, and that's the only reason I say that, and if he killed her in that regard, then I think the charge would be murder.

The case proceeded to the jury, which reached a guilty verdict, stating that "[w]e, the jury, find the Defendant, Paul Everette Woodward, guilty of Capital Murder." The capital murder conviction was based on the jury's finding that "the capital murder of Rhonda Crane was committed while Paul Woodward was engaged in the commission of rape."

The State argues that Woodward's counsel's strategy was to admit that Woodward kidnapped and murdered the victim, while attacking the proof of the underlying rape in an attempt to get the jury to settle on a verdict of simple murder and kidnapping, without a finding of capital murder. Woodward contends that the concession of guilt resulted in the complete breakdown of the adversarial process and, thus, prejudice should be presumed.

Woodward presented this claim to the Mississippi Supreme Court in his petition for post-conviction relief from his original trial. *Woodward II*, 635 So. 2d at 805. The court analyzed Woodward's claim under the two-prong *Strickland* analysis. It noted that it had "previously faced similar allegations in other cases, and found that the attorney's strategic decision to admit to a lesser crime than that charged in the indictment did not amount to deficient performance." *Id.* at 808 (citing *Wiley v. State*, 517 So. 2d 1373 (Miss. 1987) and

*Faraga v. State*, 514 So. 2d 295 (Miss. 1987)). The court found that even assuming that Woodward's counsel was deficient in the guilt phase, Woodward did not show that he satisfied the prejudice prong of *Strickland* because "[t]he proof in this case does not present reasonable probability sufficient to 'undermine confidence in the outcome.'" *Id.* at 809 (quoting *Strickland*, 466 U.S. at 694)).

Woodward urges this court to apply *Cronic*'s presumption of prejudice. "An attorney undoubtedly has a duty to consult with the client regarding 'important decisions,' including questions of overarching defense strategy." *Florida v. Nixon*, 543 U.S. 175, 187 (2004). Here, however, the trial judge afforded Woodward an opportunity to express disagreement with his counsel's tactics on the record, which he did not. Had Woodward expressed disagreement with his counsel's strategy, this might present a closer question as to whether *Cronic*'s presumption of prejudice applies. *Cf. id.* (acknowledging that defense counsel "was obliged to, and in fact several times did, explain his proposed trial strategy" to defendant, but given defendant's "constant resistance to answering inquires," defense counsel "was not additionally required to gain express consent before conceding . . . guilt"). *But see United States v. Thomas*, 417 F.3d 1053, 1057 (9th Cir. 2005) (refusing to apply *Cronic*'s presumption of prejudice where counsel conceded guilt without consulting defendant, and denying relief because defendant failed to establish prejudice under *Strickland*). We find that *Strickland*'s standard applies here.

In this case, we assume that Woodward's counsel was deficient in failing to secure Woodward's consent to the defense strategy. Nonetheless, Woodward cannot establish that the state court's findings were unreasonable in light of the evidence presented. 28 U.S.C. § 2254(d). The evidence of guilt was overwhelming, as the Mississippi Supreme Court recounted:

> In addition to separate written and videotaped confessions, which were properly admitted, the State presented a mountain of evidence. A housewife near the scene of the crime saw a white logging truck stopped in front of her house and a white man forcing a blonde woman in a yellow dress into his truck. After the truck drove off, the housewife found the victim's car on the highway, with the door open and the motor still running. A motorist reported to law enforcement officers that he saw a white logging truck moving away from a car with an open door on the highway. Woodward unquestionably was in the area that day, driving his white logging truck. His white logging truck was the only white logging truck at the logging mill. Law enforcement found a fountain pen at the crime scene matching pens found in Woodward's truck. Tests of Woodward's blood showed that he could not be excluded as the perpetrator.

*Woodward II*, 635 So. 2d at 809. "Attorneys representing capital defendants face daunting challenges in developing trial strategies, not the least because the defendant's guilt is often clear. Prosecutors are more likely to seek the death penalty, and to refuse to accept a plea to a life sentence, when the evidence is overwhelming and the crime heinous." *Nixon*, 543 U.S. at 191 (citation omitted). In this case, involving written and video confessions and corroborating evidence, "avoiding execution [may have been] the best and only realistic result possible." *Id.* (citation omitted); *accord McNeill v. Polk*, 476 F.3d 206, 217-218 (4th Cir. 2007) (rejecting, under *Strickland*, defendant's claim of ineffective assistance where counsel conceded defendant's guilt without consent); *Stenson v. Lambert*, 504 F.3d 873, 891 (9th Cir. 2007) ("When the evidence against a defendant in a capital case is overwhelming and counsel concedes guilt in an effort to avoid the death penalty, 'counsel cannot be deemed ineffective for attempting to impress the jury with his candor.'") (citation omitted). Woodward is not entitled to habeas relief on this ground.

*B. Ineffective Assistance of Counsel: Evidence of Bad Acts*

Woodward argues that during resentencing, his attorneys were constitutionally ineffective for "opening the door" to allow in evidence of Woodward's prior bad acts and for failing to object to the State's invocation of prior bad acts in its closing statement. During resentencing, defense counsel put Woodward's father on the stand. He testified that Woodward stole a car as a young Marine so he could return home for his grandfather's funeral and that Woodward had been arrested in Louisiana for attempted murder. Defense counsel also called Dr. Thurman, a private clinical psychologist retained by Woodward's family, to testify. Included in Dr. Thurman's report, which was entered into the record, was a description of Woodward's past convictions and arrests, including the attempted murder charge from Louisiana, the stolen car conviction, as well as allegedly unfounded charges of misdemeanor rape and unlawful oral sex. The prosecution used the prior arrests and bad acts to impeach defense witnesses. In addition, during his closing argument, the prosecutor commented on Woodward's history of bad acts, and the defense did not object to this argument.

Woodward contends that the admission of the evidence of bad acts was the reason the jury did not list "lack of serious criminal history" as a mitigating factor in its verdict. The state court found that Woodward's counsel presented the bad acts evidence in the context that these acts were examples of Woodward's long battle with mental illness. It found that his counsel made strategic choices regarding the mitigation case, showing sound trial strategy rather than deficient performance. The state court also found that Woodward had not shown any prejudice to his defense.

The district court agreed with this assessment. It found that because the prosecution would have been able to introduce the bad acts because they were referred to in Dr. Thurman's report, the defense counsel were not objectively

11

unreasonable for preemptively introducing the evidence in order to best fit it into their trial strategy. Moreover, the district court found Woodward could not demonstrate that he had been prejudiced by counsel's alleged deficiency because the balancing test which the jury was to employ to determine whether Woodward should receive the death penalty was unaltered by the introduction of the bad acts evidence.

The question under the first *Strickland* prong is whether Woodward demonstrated "that counsel's representation fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521. There is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Romero v. Lynaugh*, 884 F.2d 871, 879 (5th Cir. 1989) (internal quotation and citation omitted). "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Martinez v. Dretke*, 404 F.3d 878, 885 (5th Cir. 2005) (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)).

Woodward argues that the bad act evidence in question could not have been admitted by the prosecution and therefore, it was not a reasonable trial strategy to open the door to it and to fail to object to the State's use of the evidence during closing arguments. Mississippi Rule of Evidence 705 states:

> The expert may testify in terms of opinion or inferences and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or date on cross-examination.

MISS. R. EVID. 705. The Mississippi Supreme Court, in reviewing this claim, held that: "[S]ince Woodward's prior criminal history was included in Dr. Thurman's report as part of the information which formed the basis for his

opinions, Woodward's trial counsel could not have been successful in any objection raised regarding the contents of the report." *Woodward IV*, 843 So. 2d at 9.[4] Therefore, Woodward's counsel was not deficient in preemptively introducing the evidence or in failing to object to the evidence during closing arguments.

Woodward also argues that both the district court and the state court failed to take into account that "regardless of Mississippi evidentiary law, the way in which the prosecution was permitted to lead the jury to return a death sentence based on inaccurate or unreliable information runs afoul of the Eighth Amendment." Woodward cites to three Supreme Court cases in support of this argument: *Zant v. Stephens*, 462 U.S. 862, 887, nn. 23, 24 (1983), *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Locket v. Ohio*, 438 U.S. 586 (1978). Importantly, Woodward presents no evidence that Dr. Thurman's report actually contained "inaccurate or unreliable" information. Woodward reported to the psychologist during his evaluation that he committed those crimes, and beyond bare allegations, he presents no evidence that his statements were untrue or otherwise unreliable.

Even assuming that Woodward's counsel was deficient, both the Mississippi Supreme Court and the district court found that Woodward failed to demonstrate that he was prejudiced by such deficiency. In the context of capital resentencing, the standard is "whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695. Woodward argues that he was prejudiced because once the

---

[4] As discussed in depth in the district court's opinion, there is some inconsistency between this holding and the Mississippi Supreme Court's prior treatment of this matter. Despite this inconsistency, *Woodward IV* is clear that under Mississippi law, the prosecution would have been entitled to introduce these prior bad acts.

prosecutor was able to delve into Woodward's bad acts, he was able to subvert the mitigating factor "lack of prior criminal history" into an unenumerated aggravating factor.

Juries are presumed to follow the law. *See United States v. Musquiz*, 45 F.3d 927, 931 (5th Cir. 1995). Under Mississippi law, a death sentence cannot be based on non-statutory aggravating factors. *See* MISS. CODE ANN. § 99-19-101. In accordance with this rule, the jury was instructed to recommend the death sentence only if it found that the presence of the statutorily-provided aggravating factors outweighed the presence of the statutorily-provided mitigating factors. Here, the jury listed three aggravating factors: (1) that the capital murder occurred during the commission of rape; (2) that the murder was particularly heinous; and (3) that the offense was committed for the purpose of avoiding arrest or effecting escape from custody. Evidence of Woodward's alleged prior bad acts would have no bearing on the jury's findings regarding these three aggravating factors. Thus, even assuming *arguendo* that Woodward's counsel was deficient, the state court's findings are not unreasonable in light of the evidence presented. Woodward is not entitled to habeas relief on this claim.

C. *Request for Independent Psychiatric Expert*

Woodward's counsel made efforts to obtain an independent psychiatric evaluation at the first trial in 1987, and again at resentencing in 1995. They sought assistance to have Woodward examined by a psychiatrist regarding his mental and emotional state and to determine Woodward's competency at the time of the crime, sought evaluation by a psychiatrist versed in sexual psychopathic behavior, and sought assistance of a mental health expert to assist Woodward in his defense. They also argued that a psychiatric evaluation would allow the defense team to assess the presence of mitigating circumstances. At

14

the motion hearing, the trial court suggested that Woodward be examined by Whitfield State Hospital ("Whitfield"). Defense counsel argued that this would be insufficient and requested funds to hire their own psychiatric expert. The trial court denied their requests and ordered Woodward to be taken to Whitfield to receive a psychiatric examination. The order required the hospital to report its findings to defense counsel, the prosecutors, and the court. Later, after Woodward's family paid for an initial consultation with Dr. Thurman, Woodward filed a motion to obtain additional funds to secure Dr. Thurman's attendance at trial and for additional evaluation. This request was granted.

After remand, Woodward was represented by Attorneys Rushing and Adelman at his 1995 resentencing. Rushing and Adelman sought, before the resentencing, funds to hire an independent psychiatrist. The funding motion was supplemented with two affidavits, one from Dr. Thurman and one from Dr. Ritter, a psychiatrist willing to assist defense counsel. Dr. Thurman's affidavit stated that

> [g]iven the severity of Mr. Woodward's emotional problems, I believe that his request for examination and assistance by a forensic psychiatrist is reasonably necessary to his defense. Such an examination would complement my own interviews and provide a different perspective regarding his emotional problems. I believe such further examination by a medically licensed psychiatrist would not be cumulative and would contribute substantially and significantly to Mr. Woodward's defense.

The court granted and denied the motions in part. It sustained the part of the defense motion requesting Dr. Thurman's continued assistance, but denied the part of the motion requesting funds for Ritter. The court also ordered that "the defendant be allowed evaluation at [Whitfield] if he so desires psychiatric examination." Woodward was not examined at Whitfield.

Woodward argues that the Mississippi Supreme Court's decision to deny funds for an independent psychiatrist was an unreasonable application of *Ake v. Oklahoma*, 470 U.S. 68 (1985). He contends that the opportunity to be examined by a psychiatrist at the state mental hospital was insufficient and that his rights were violated when he was not provided with an independent psychiatrist at resentencing. This issue was presented to, and rejected by, the Mississippi Supreme Court. Thus, as discussed above, for Woodward to be entitled to relief he must demonstrate that the Mississippi Supreme Court's decision was "contrary to, or an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d).

In *Ake*, the Supreme Court held that, upon request, a trial court must appoint a psychiatrist for an indigent defendant if a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial and, in the context of a capital sentencing proceeding, when the state presents psychiatric evidence of the defendant's future dangerousness. *Ake*, 470 U.S. at 82-83. The Court explained that "when the State has made the defendant's mental condition relevant to his criminal culpability and to the punishment he might suffer, the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense." *Id.* at 80.

The state court found Woodward's rights were not violated because the order allowing Woodward to be examined at Whitfield satisfied *Ake*. Under *Ake*, a criminal defendant is not entitled "to choose a psychiatrist of his personal liking or to receive funds to hire his own." *Woodward III*, 726 So. 2d at 529 (citing *Ake*, 470 U.S. at 83). Rather, the defendant must be afforded access to a "competent psychiatrist." *Id.* The district court agreed, holding that the court-authorized psychiatrists that would have performed his evaluation were

16

"neutral," and thus satisfied *Ake*'s requirements. In accord with this circuit's interpretation of *Ake*, we also agree.

In *Granviel v. Lynaugh*, 881 F.2d 185, 191 (5th Cir. 1989), an indigent defendant challenged Texas's practice of allowing a trial judge to appoint an expert to evaluate the defendant and provide a report to both the prosecution and the defense. Relying on *Ake*, we upheld the procedures, stating:

> Granviel's ability to uncover the truth concerning his sanity is not prejudiced by a court-appointed, neutral expert. Availability of a neutral expert provides defendants with "the raw materials integral to the building of an effective defense." *Ake*, 105 S. Ct. at 1093. The state is not required to permit defendants to shop around for a favorable expert. . . . He has no right to the appointment of a psychiatrist who will reach biased or only favorable conclusions.

*Granviel*, 881 F.2d at 192.[5] Instead, the Court's "concern [was] that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and . . . [it left] to the State the decision on how to implement this right." *Ake*, 470 U.S. at 83; *accord Smith v. Mitchell*, 348 F.3d 177, 208 (6th Cir. 2003) (holding that *Ake* does not entitle a defendant to an independent psychiatrist of his choosing, only a competent psychiatrist). *But see Starr v. Lockhart*, 23 F.3d 1280, 1290-91 (8th Cir. 1994) (stating that *Ake* "expressly disavows" the theory that due process is satisfied by the appointment of a neutral expert); *Smith v. McCormick*, 914 F.2d 1153, 1158-59 (9th Cir. 1990)

---

[5] The Supreme Court denied certiorari in *Granviel v. Texas*, 495 U.S. 963 (1990). Justices Marshall and Brennan dissented from the denial of certiorari, arguing that the Texas procedure is unconstitutional because *Ake* was "directed at providing a defendant with the tools necessary to present an effective defense within the context of our adversarial system, in which each party marshals evidence favorable to its side and aggressively challenges the evidence presented by the other side." *Id.* at 964 (Marshall, J., dissenting). The dissent argued that Texas's provision of a "disinterested" expert does not satisfy *Ake*, because the function of the psychiatrist is to assist the defendant in preparing and presenting his defense. This position has not been adopted by the Supreme Court, and therefore, AEDPA's limitations apply.

("Under *Ake*, evaluation by a 'neutral' court psychiatrist does not satisfy due process. . . . [The defendant] was entitled to his own competent psychiatric expert."); *United States v. Sloan*, 776 F.2d 926, 929 (10th Cir. 1985) (finding that a state's duty under *Ake* "cannot be satisfied with the appointment of an expert who ultimately testifies contrary to the defense on the issue of competence").

*Ake* does not clearly provide a constitutional right to an "independent" psychiatrist. Given the lack of a clear Supreme Court holding that a defendant is entitled to independent psychiatric assistance and the different circuit interpretations of *Ake* on this point, the decision of the Mississippi Supreme Court was not "contrary to" or an "unreasonable application of" clearly established federal law. *See Williams v. Taylor*, 529 U.S. 362, 381 (2000) (relief precluded if the Supreme Court has not "broken sufficient legal ground" on a constitutional principle advanced by a petitioner).

It is undisputed that Woodward refused to be examined at Whitfield for the resentencing. Woodward therefore does not argue that the examination provided for him was inadequate; rather, he argues that it would have been inadequate. In support, he points to his previous Whitfield examination, obtained in 1987. He argues that this examination contained grave deficiencies, including that no tests were given to evaluate the possibility of organic brain damage. However, Whitfield limited the scope of the 1987 examination to establish whether Woodward was competent to stand trial and whether he was capable of distinguishing right from wrong at the time of the crime. Given the different scope of the resentencing proceedings, it is entirely possible that the Whitfield examination for purposes of resentencing would have been different in nature and may have been more focused on identifying and developing other

mitigating evidence.[6] Woodward provides no evidence establishing that the hospital would not have provided the tests or was unable to provide the tests. Woodward therefore is not entitled to habeas relief on this claim.

### D. District Court's Denial of Woodward's § 848 Request for Funding

In the district court, Woodward applied for expert funds pursuant to 21 U.S.C. § 848 (q)(4) and (q)(9),[7] contending that the assistance of a psychiatrist was needed to determine whether, at the resentencing, a comprehensive forensic evaluation would have revealed mitigating factors for defense counsel to present at the resentencing. The district court denied the motion, finding that "Woodward's application is not clear as to why the evaluations of the state hospital and Dr. Thurman did not comply with *Ake*." The district court therefore concluded that Woodward had not established that granting him the funds to retain Dr. Summers was "reasonably necessary" to pursue his habeas petition.[8]

The State argues that this court lacks jurisdiction over this claim because Woodward failed to include the order denying expert assistance in his notice of appeal. Woodward argues that the interim order denying funding merged into the final judgment; therefore, his notice of the appeal of the final judgment also noticed the appeal of the order denying funding. It is undisputed that Woodward's notice of appeal does not specifically reference the order; instead it

---

[6] Alternatively, and as the district court stated, "[h]ad Woodward gone to the State Hospital for another evaluation, he may have actually been supplied with evidence to support his theory that the psychiatrists there were predisposed to favor the State's position."

[7] This provision was repealed by Public Law 109-77, 120 Stat. 231, Title II, Sec. 222 (March 9, 2006). Such funding is now governed by 18 U.S.C. § 3599 (f) and (g)(2).

[8] Although Woodward did not request a COA on this claim, a COA is not necessary to appeal the denial of funds for expert assistance. *See Smith v. Dretke*, 422 F.3d 269, 288 (5th Cir. 2005).

states that Woodward "now provides notice of his appeal . . . from the final judgment entered in this action on August 3, 2006."

A notice of appeal is required to "designate the judgment, order, or part thereof being appealed." FED. R. APP. P. 3(c)(1)(B). The general rule is that "[w]here the appellant notices the appeal of a specified judgment only or a part thereof . . . this court has no jurisdiction to review any other judgments or issues which are not expressly referred to and which are not impliedly intended for appeal." *Lockett v. Anderson*, 230 F.3d 695, 699 (5th Cir. 2000) (quoting *Capital Parks, Inc. v. Se. Advert. & Sales Sys., Inc.*, 30 F.3d 627, 630 (5th Cir. 1994)). However, "[a]n appeal from a final judgment preserves all prior orders intertwined with the final judgment." *New York Life Ins. Co. v. Deshotel*, 142 F.3d 873, 884 (5th Cir. 1998) (internal quotation and citation omitted).

An appellate court's consideration of the denial of § 848 funding will often implicate the merits of a petitioner's habeas claim. *See Smith*, 422 F.3d at 288. Even if there was a mistake in designating the judgment, a mistake in designating orders to be appealed should not bar review "if the intent to appeal a particular judgment can be fairly inferred, and if the appellee is not prejudiced or misled by the mistake." *Friou v. Phillips Petroleum Co.*, 948 F.2d 972, 974 (5th Cir. 1991) (citation omitted). Woodward's intent to appeal this issue is clear from an examination of Woodward's request for a COA in the district court and his opening appellate brief, both of which explicitly reference the § 848 denial. *See Deshotel*, 142 F.3d at 884. Also, the State has not demonstrated that it was in any way prejudiced by Woodward's failure to designate the § 848 denial in his notice of appeal. *Id.*

Pursuant to 21 U.S.C. § 848(q)(9), a district judge, in a capital case, "upon a finding that investigative, expert, or other services are reasonably necessary for the representation of the defendant," may authorize funding for such

services. *Foster v. Johnson*, 293 F.3d 766, 775 n.8 (5th Cir. 2002). We review for an abuse of discretion the denial of § 848 funding. *Smith*, 422 F.3d at 288. The denial of such funding has been upheld "when a petitioner has (a) failed to supplement his funding request with a viable constitutional claim that is not procedurally barred, or (b) when the sought-after assistance would only support a meritless claim, or (c) when the sought after assistance would only supplement prior evidence." *Id*. (citations omitted). In light of our holding on the merits of Woodward's *Ake* claim, we hold that the district court did not abuse its discretion in denying the funding request.

### E. Batson Claim

The Supreme Court has made clear that the Equal Protection Clause of the Fourteenth Amendment prohibits prosecutors from striking prospective jurors solely on the basis of race. *Batson v. Kentucky*, 476 U.S. 79, 89 (1986); *Moody v. Quarterman*, 476 F.3d 260, 266 (5th Cir. 2007). In *Miller-El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court explained some of the effects of racial discrimination in jury selection:

> [P]rosecutors drawing racial lines in picking juries establish state-sponsored group stereotypes rooted in, and reflective of, historical prejudice . . . . When the government's choice of jurors is tainted with racial bias, that overt wrong casts doubt over the obligation of the parties, the jury, and indeed the court to adhere to the law throughout the trial. That is, the very integrity of the courts is jeopardized when a prosecutor's discrimination invites cynicism respecting the jury's neutrality, and undermines public confidence in adjudication[.] So, for more than a century, this Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause.

*Miller-El*, 545 U.S. at 237-38 (internal citations, quotations, and alterations omitted). "[T]he Constitution forbids striking even a single prospective juror for

a discriminatory purpose." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1208 (2008) (quoting *United States v. Vasquez-Lopez*, 22 F.3d 900, 902 (9th Cir. 1994)).

In *Batson*, the Court delineated a three-step analysis for evaluation of a defendant's claim that a prosecutor used a peremptory strike in a racially discriminatory manner: (1) a defendant must make a prima facie showing that the prosecutor exercised his peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question; and (3) the trial court must determine whether the defendant carried his burden of proving purposeful discrimination. *See Hernandez v. New York*, 500 U.S. 352, 358-59 (1991) (plurality opinion) (citing *Batson*, 476 U.S. at 96-98); *Moody*, 476 F.3d at 266-67. This analysis "permits prompt rulings on objections to peremptory challenges without substantial disruption to the jury selection process." *Hernandez*, 500 U.S. at 359. The ultimate burden of persuasion lies with the defendant. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995).

Upon remand, the trial court conducted jury selection for Woodward's resentencing. The State peremptorily challenged six jurors, including three black members of the venire panel. At this point, Woodward raised a claim under *Batson*. The court requested that the State offer reasons for striking the three black jurors, numbers 7, 12, and 22, to which the following colloquy ensued:

> MR. WHITE: If it please the Court, the State's reasons on No. 7[,] [Ms.] Proctor, she is unemployed and on a previous case was unable to reach a verdict. Juror No. 12, [Ms.] McAbree, was unresponsive. Mr. Klein and Mr. Callahan both indicated to me that she was very hostile when the State was on voir dire and open to the defense. Further that her relative works in Leakesville with the prison system and we struck her on that basis. We didn't want her to have any affiliations with that. . . .

. . . [Ms.] Steele [Juror No. 22] . . . That's the lady with the orange hair that gave unresponsive answers.

COURT: And that's the one that you proffered for cause but the Court did not allow.

MR. ADELMAN: But as far as Proctor goes, I'd say that the fact that she was unable to reach a verdict in some prior jury is not a racially neutral reason. It's a non-race and it's an irrelevant reason.

MR. WHITE: It doesn't have to be a relevant reason as long as it's race neutral.

COURT: Are there others?

MR. ADELMAN: McAbree, No. 12. He said something about that she was hostile. I remember her as being very cooperative.

MR. WHITE: That's exactly what we're saying, she was cooperative with you.

MR. ADELMAN: No, she was cooperative with everybody. I don't remember her being hostile.

COURT: The Court is of the opinion that the strikes were not racially motivated and was not being done to constitute members of a certain race on the jury panel. . . .

Woodward then offered his strikes. During the next series of strikes, the State struck four additional jurors, among these jurors was one black juror, Juror 56. Woodward objected, stating that "[t]hey struck the only black in that group, who was [Ms.] Griffin. They have now struck every black available." The State responded:

MR. WHITE: . . . [Ms.] Griffin on S-10.

MR. ADELMAN: She's black.

MR. WHITE: Yes. We talked to Jerry Gardner. She is related to another potential juror, No. 67, on the panel, *but her husband has had law enforcement problems at a trailer park, according to Jerry Gardner. And we struck her on that basis.* We thought there might be some empathy with that particular case. She lives in the Sand Ridge Trailer Park here in New Augusta.

23

The trial court denied the objection and struck her from the panel.

Two more series of strikes followed, and the State struck Ms. Williams, Juror 67, who is black. The State offered as an explanation the fact that she was a psychology major and that they did not have a written response from her. The trial court ruled that the strike was not made for a racially motivated reason, and struck Ms. Williams from the panel.

The court then moved to the selection of the alternates. Woodward struck the first alternate, and the State struck the next alternate, Juror 72, who is black. The State said that its strike was based on his response to the rape question, as well as the fact that his brother-in-law is a convicted felon. The defense then stated: "For the record, we want to note that [Juror 72] is black. They have now struck every black juror." As a result of these challenges, every black person was removed from the jury panel, and the jury that was eventually empaneled was composed entirely of white members.

At the resentencing, the State did not dispute whether Woodward made a prima facie showing that the State exercised its peremptory challenges on the basis of race, and we need not address the first prong of the *Batson* analysis. *Hernandez*, 500 U.S. at 359 ("Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."). For the second step of the analysis, a prosecutor is not allowed to merely deny that he did not have a discriminatory motive; he must provide a specific explanation that is clear and reasonable. *Elm*, 514 U.S. at 768. The second step, however, "does not demand an explanation that is persuasive, or even plausible." *Id*.

Woodward's *Batson* claim was presented to the Mississippi Supreme Court on direct review of the resentencing trial. *Woodward III*, 726 So. 2d at 529-534.

24

That court reviewed each peremptory challenge and concluded that the State had met its burden of offering race-neutral reasons for its peremptory challenges. *Id.* at 530-533. The court noted that "[t]he establishment of a race-neutral reason is not a difficult task" and that a "trial judge's factual findings relative to a prosecutor's use of peremptory challenges on minority persons are to be accorded great deference." *Id.* at 530 (citing *Stewart v. State*, 662 So. 2d 552, 557-58 (Miss. 1995)). Woodward has not demonstrated that the Mississippi Supreme Court's decision was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). We find no error in the state court's finding that the State satisfied the second prong of the *Batson* analysis.

Whether a defendant has carried his burden under *Batson*'s third step to prove purposeful discrimination is based on the persuasiveness and credibility of the prosecutor's justification for his exercise of the peremptory strike. *Id.* Because of the importance of demeanor and credibility evidence in making such determinations, we give strong deference to the determination of the trial judge, consistent with AEDPA. *See Hernandez*, 500 U.S. at 369 ("[W]e decline to overturn the state trial court's finding on the issue of discriminatory intent unless convinced that its determination was clearly erroneous."). However, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Elm*, 514 U.S. at 768.

Woodward argues that the trial court's failure to make a finding of demeanor as to Ms. McAbree establishes a *Batson* error, relying on *Snyder v. Louisiana*, 128 S. Ct. 1203 (2008). Where the peremptory challenge is based on a potential juror's demeanor, "the trial court must evaluate not only whether the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike

25

attributed to the juror by the prosecutor." *Snyder*, 128 S. Ct. at 1208. Factual findings relating to the juror's demeanor are essential to our review of a *Batson* claim. *See id.* at 1209. In *Snyder*, the prosecution offered two race-neutral reasons for striking a potential juror: the "main reason" was that the juror "looked very nervous" throughout questioning; the other reason related to the juror's commitments as a student teacher. *Id.* at 1208. The defendant disputed both explanations. The Supreme Court reversed, based in part on the "absence of anything in the record showing that the trial judge credited the claim that Mr. Brooks was nervous." *Id.* at 1212.

> Rather than making a specific finding on the record concerning Mr. Brooks' demeanor, the trial judge simply allowed the challenge without explanation. It is possible that the judge did not have any impression one way or the other concerning Mr. Brooks' demeanor. . . . Or, the trial judge may have found it unnecessary to consider Mr. Brooks' demeanor, instead basing his ruling completely on the second proffered justification for the strike. For these reasons, we cannot presume that the trial judge credited the prosecutor's assertion that Mr. Brooks was nervous.

*Id.* at 1209. In this case, as in *Snyder*, the State offered multiple reasons for striking McAbree and we cannot presume that the trial court credited the State's assertion that McAbree was hostile. Woodward, however, has failed to show that the state court's factual findings were unreasonable in light of the evidence presented.

Woodward did not rebut the State's race-neutral reason for all the other challenges. On appeal, however, Woodward nonetheless argues that he is entitled to relief under *Batson* because (1) the reasons given by the State for striking black jurors were not equally applied to white jurors; and (2) both the district court and the Mississippi State Supreme Court erred by considering each peremptory challenge individually, rather than examining "the totality of the relevant facts about a prosecutor's conduct during the defendant's own trial."

26

Relying on *Miller-El* and *Snyder*, Woodward argues that as long as the relevant facts were before the trial court, it was not necessary that particular arguments be made in support of a showing of pretext. Essentially, Woodward would impose on the state trial court the duty to conduct a comparison analysis to identify possible instances where the reasons for peremptory challenges are unequally applied to black and white jurors, regardless of whether a defendant articulates a rebuttal argument regarding unequal application of reasons for strikes. Woodward relies heavily on the following language from a footnote in *Miller-El* to support his argument:

> The dissent contends that comparisons of black and nonblack venire panelists, along with Miller-El's arguments about the prosecution's disparate questioning of black and nonblack panelists and its use of jury shuffles, are not properly before this Court, not having been put before the Texas courts. But the dissent conflates the difference between evidence that must be presented to the state courts to be considered by federal courts in habeas proceedings and theories about that evidence.

*Miller-El*, 545 U.S. at 241 n.2 (internal quotations and citations omitted). In the same footnote, the Court goes on to explain that

> [t]here can be no question that the transcript of voir dire, recording the evidence on which Miller-El bases his arguments and on which we base our result, was before the state courts, nor does the dissent contend that Miller-El did not fairly present his *Batson* claim to the state courts. Only as to the juror questionnaires and information cards is there question about what was before the state courts.

*Id*. (internal quotations and citations omitted). Because a defendant has the ultimate burden of persuasion, it is important that he "fairly present" his claim to the state court in seeking to persuade the state court that discrimination exists.

The State relies heavily on this court's decisions in *Wright v. Harris County*, 536 F.3d 436 (5th Cir. 2008) and *United States v. Arce*, 997 F.2d 1123,

27

1127 (5th Cir. 2008), to argue that Woodward waived his *Batson* claim by failing to rebut the State's race-neutral reasons for striking the black jurors. *Wright* was a civil suit where only one black venireman had a "realistic chance" of serving on the jury. *Wright*, 536 F.3d at 437. In *Arce*, a noncapital criminal case, we held that "[b]y failing to dispute the prosecution's . . . explanation in the district court, defendants have waived their right to object to it on appeal." Capital cases employ different standards than noncapital cases at times, and our more recent decision in *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009), suggests that waiver does not apply in capital cases.

> [T]he trial court stated at the hearing that it was considering only the voir dire transcripts of the ten African-American jurors that the prosecution struck, not those of any other jurors. Further, the prosecutor noted, "[a]t no time has [Miller-El] urged that there are unchallenged venire persons who did not have these same traits that the prosecutors testified either at trial or in this hearing that they relied on in exercising the State's peremptory challenges." Miller-El did not respond to this statement and did not ask the court to consider any other portions of the voir dire transcript. After reviewing the voir dire transcript of only the challenged jurors, the judge accepted the prosecutor's race-neutral explanations for the strikes and found that there was "no purposeful discrimination." The [Texas Court of Criminal Appeals] affirmed, stating that it had "carefully reviewed the voir dire examination" of the prospective black jurors and found "ample support . . . for the prosecutor's racially neutral explanations." Again, it is important to emphasize that the TCCA never reviewed the entire voir dire transcript or considered a comparative analysis.

*Reed*, 555 F.3d at 371. Notwithstanding that "Miller-El's arguments gave the state court no reason to go leafing through the voir dire transcript," the *Miller-El* majority "soundly rejected" the dissent's argument that the state court's consideration of evidence supporting a *Batson* claim is "unrealistic." *Id.* at 372 (quoting *Miller-El*, 545 U.S. at 283 (Thomas, J., dissenting)). *Contra Snyder*, 128 S. Ct. at 1214 (Thomas, J., dissenting) ("We have no business overturning a

conviction, years after the fact and after extensive intervening litigation, based on arguments not presented to the courts below."). We therefore decline to find that Woodward waived any *Batson* claim based on a comparison analysis. Woodward nonetheless must carry his burden of proving purposeful discrimination, and for purposes of our review, he must demonstrate that the state court's factual findings were unreasonable in light of the evidence presented.

In *Miller-El*, the Court recognized that Miller-El's evidence was open to judgment calls "at some points," but the Court considered substantial evidence in determining that discrimination existed, including juror comparisons, statistical data,[9] prosecutors' use of a procedure known as the jury shuffle,[10] contrasting *voir dire* questions, "manipulative minimum punishment questioning," and the Dallas County office prosecutors' "specific policy of systematically excluding blacks from juries."[11] In this case, Woodward relies on statistics and jury comparisons to argue that the state court clearly erred in finding no discrimination.

---

[9] In that case, there were 20 black members of a 108-person venire panel. *Miller-El*, 545 U.S. at 240. One served, 9 were excused for cause, and 10 were peremptorily struck. *Id.* at 240-41. The Court stated that "[h]appenstance is unlikely" the cause of the prosecutors use of peremptory strikes to exclude 91% of black jurors. *Id.* at 241.

[10] The Court described Texas's jury shuffle procedure as follows:
[E]ither side may literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire panel are seated and reached for questioning. Once the order is established, the panel members seated at the back are likely to escape *voir dire* altogether, for those not questioned by the end of the week are dismissed.

*Id.* at 253. The Court also noted that the prosecutors noted the race of each panelist on all of the juror cards. *Id.* at 250 n.7.

[11] *Id.* at 261-63.

The State used peremptory strikes to exclude 100% of black jurors, but Woodward has not provided the Court with information regarding the makeup of the entire jury pool. *See Medellin v. Dretke*, 371 F.3d 270, 278 (5th Cir. 2004) ("For the statistical evidence to be relevant, data concerning the entire jury pool is necessary. The number of strikes used to excuse minority and male jury members is irrelevant on its own.")*; cf. United States v. Alverado*, 923 F.2d 253, 255 (2d Cir. 1991) ("[T]he prosecution's challenge rate against minorities was 50 percent (three of six) in the selection of the jury of 12, and 57 percent (four of seven) in the selection of the jury of 12 plus alternates. Whether this rate creates a statistical disparity would require knowing the minority percentage of the venire; for example, if the minority percentage of the venire was 50, it could be expected that a prosecutor, acting without discriminatory intent, would use 50 percent of his challenges against minorities."). For example, if there are only 3 black members of a 100-member venire panel, i.e., 3% black, there is a weaker argument that exclusion of 100% of the black members evidences purposeful discrimination. If, however, there were 10 black members of a 40 member venire panel, i.e., 25% black, the argument strengthens as to purposeful discrimination if the State strikes 100% of the black members. We know that the peremptory challenges were used to exclude 100% of the black jury venire members, but this statistic standing alone does not support a finding of discrimination.

Woodward also makes a comparison analysis to establish purposeful discrimination. In total, the State used six peremptory challenges to strike all available black jurors: Ms. Proctor, Ms. McAbree, Ms. Steele, Ms. Griffin, Ms. Williams, and Mr. O'Banner.[12] With respect to Ms. Proctor, the State alleged that it struck her because she was unemployed and on a previous case was

---

[12] Mr. O'Banner was an alternate juror.

unable to reach a verdict. Woodward does not assert that white members of the panel were similarly situated, but he suggests that the court and the State should have further explored the reasons for the strike. "[T]he prosecution's failure to question a potential juror about a characteristic that the State asserts is important is evidence that the asserted reason was actually a pretext for discrimination." *Reed*, 555 F.3d at 376 (citing *Miller-El*, 545 U.S. at 246). A review of the State's *voir dire* reveals that it asked no questions regarding employment or prior jury service. Because employment and prior jury service questions were on the juror questionnaire, however, it does not automatically follow that absence of the questions in *voir dire* is indicative of pretext. On habeas review, Woodward had to make a stronger showing to establish that the state court's findings were unreasonable in light of the evidence presented. He has not made that showing.

The State alleged that it struck Ms. McAbree because she was unresponsive, hostile, and had relatives that work in the prison system. As we discussed *supra*, the trial court made no findings regarding Ms. McAbree's hostility, and we do not presume that it credited the State's assertion of that reason. Woodward still offers no rebuttal to the State's first race-neutral reason, that Ms. McAbree was unresponsive. In his brief, Woodward simply ignores this race-neutral reason, stating that the prosecutor provided only two reasons. We find no error in the state court's finding of no race discrimination in the State's striking of Ms. McAbree.

The State originally challenged Ms. Steele for cause, stating that she was incoherent and unresponsive. The trial judge[13] offered to bring her back for *voir*

---

[13] The trial judge seemed to agree with the State's characterization, stating that "[s]he was incoherent at times I thought, and her body language was such that she did appear nervous."

*dire*, but the State declined. Woodward offers no evidence of discriminatory intent except the fact that Ms. Steele was black. Again, where Woodward fails to rebut the State's race-neutral reason for striking a juror, evidence of race standing alone offers little evidence of discriminatory intent. The state court was not unreasonable in finding no race discrimination.

Regarding Ms. Griffin, Woodward misinterprets the record as to the State's reason for striking her. Woodward asserts that the State struck Ms. Griffin because she had a relative on the jury and because her husband had law enforcement problems. Read in context, it is clear that the State struck her because her husband had law enforcement problems, not because she had a relative on the jury. Notably, the record does not show the relevance of Jerry Gardner, but Woodward made no objection to the State's reliance on Mr. Gardner's information relating to Ms. Griffin's husband's problem with law enforcement. A finding of no discriminatory intent in the State's use of a peremptory strike to exclude Ms. Griffin is not unreasonable in light of the evidence presented.

Regarding Ms. Williams, the State based its strike on the fact that she was a psychology major, and it added that it did not have a written response from her. Again, Woodward only attempts to challenge the State's reason based on the lack of a written response, arguing that others failed to respond. The primary reason for the State's strike was based on Ms. Williams studies in psychology. During *voir dire*, one of the questions the State asked was "[h]ave you or a member of your family ever studied psychology or any type of field such as that?" Ms. Williams indicated that psychology was her major in college, and the State asked her several questions relating to the topic. The evidence

supports the trial court's finding that the State did not strike her for a racially motivated reason, and the decision was not unreasonable.

Finally, Woodward offers no argument on appeal relating to Mr. O'Banner, other than the fact that he is black. Considering the entire record, Woodward has not demonstrated that the Mississippi Supreme Court's denial of his *Baton* claim was based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). Accordingly, Woodward is not entitled to habeas relief on this claim.

## CONCLUSION

For the reasons discussed above, Woodward's request for habeas relief is **DENIED**.